**SIGNED THIS: March 30, 2007**

                                    **THOMAS L. PERKINS**
                    **UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| FLEMING PACKAGING CORP., | ) | No. 03-82408 |
| | ) | |
|            Debtor. | ) | |
| | ) | |
| GARY T. RAFOOL, not individually, but as trustee for the above bankruptcy estate, | ) ) | |
|            Plaintiff, | ) ) | |
| vs. | ) | Adv. No. 05-8124 |
| PROPACK SYSTEMS, LLC, | ) ) | |
|            Defendant. | ) | |

### O P I N I O N

This matter is before the Court on the Motion for Summary Judgment filed by the Defendant, Propack Systems, LLC (PROPACK). The Complaint filed by Gary T. Rafool, Chapter 7 Trustee for the estate of Fleming Packaging Corp. (TRUSTEE), alleges that shortly before the Debtor, Fleming Packaging Corp. (DEBTOR), filed for bankruptcy relief,

it sold to PROPACK certain assets worth $5.7M for a price of only $387,805.01. In Count I, the TRUSTEE characterizes the transfer as fraudulent and avoidable under 11 U.S.C. § 548(a)(1)(B) and, alternatively, in Count II, pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5(a)(2). Only constructive fraud (fraud in law) is at issue; no claim of intentional fraud (fraud in fact) is asserted.

In its Amended Answer, PROPACK admits purchasing certain assets (the "Transferred Assets") for $387,805.01 and admits that the transaction closed on April 25, 2003, eighteen days before the DEBTOR filed its petition for Chapter 11 relief. PROPACK contends that it paid reasonably equivalent value for the Transferred Assets. PROPACK denies, however, that the Transferred Assets were owned by the DEBTOR. Instead, PROPACK contends that the Transferred Assets were owned by fp Packaging, Inc. (PACKAGING), a California corporation that was a separate and distinct entity from the DEBTOR.

In its Motion for Summary Judgment, PROPACK asserts that there was no transfer of any property interest of the DEBTOR and that the TRUSTEE lacks standing to avoid the transfer of property owned by PACKAGING, a non-debtor corporation. PROPACK points to the fact that Bank One held a lien on all of the DEBTOR'S assets so that even if it is determined that the Transferred Assets were property of the DEBTOR, a transfer of fully encumbered property is not avoidable under the Uniform Fraudulent Transfer Act (UFTA), since its definition of "asset" does not include property of the debtor to the extent encumbered by a valid lien. Cal.Civ.Code § 3439.01 (a)(1); 740 ILCS 160/2(b)(1).

The TRUSTEE disputes PROPACK'S contention that the Transferred Assets were owned by PACKAGING, arguing that a question of material fact exists as to which corporation actually owned the Transferred Assets and, alternatively, even if owned by PACKAGING, that the corporate veil between the DEBTOR and PACKAGING, its wholly owned subsidiary, should be pierced and the Transferred Assets treated as if owned by the DEBTOR.

The primary purpose of summary judgment is to isolate and dispose of factually unsupported claims. *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC,* 464 F.3d 659, 664 (7th Cir. 2006). The court's function is to determine whether there is a genuine issue for trial. *Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 490 (7th Cir. 2007). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**Alter Ego Doctrine**

PROPACK points out that the TRUSTEE'S veil-piercing or alter ego theory has not been pleaded, having been raised for the first time in the TRUSTEE'S Response to PROPACK'S Motion for Summary Judgment. Because an alter ego allegation is not a claim for substantive relief, it is not strictly necessary that it be pleaded. *Hennessey's Tavern, Inc. v. American Air Filter Co.,* 204 Cal.App.3d 1351, 1358-59, 251 Cal.Rptr. 859 (Cal.App. 2 Dist. 1988). Nevertheless, the parties have briefed the issue and agree that California supplies the procedural and substantive law of veil-piercing. *See Hennessey's Tavern* at 1359.

PROPACK contends that the alter ego doctrine may not be used to the prejudice of an innocent third party who has dealt with a corporation as such, citing *United States Fire Ins. Co. v. National Union Fire Ins. Co.,* 107 Cal.App.3d 456 (Cal.App. 2 Dist. 1980). That case involved an insurance coverage dispute arising from the death of Philip Morgan, Jr., the president and chairman of the board of directors of U.S. West Investments. The plaintiff insurance company alleged that the policy issued by the defendant to U.S. West Investments, which excluded Morgan from the definition of insured, should be construed to include him as an insured on the theory that U.S. West Investments was the alter ego of Morgan. The trial court agreed with the plaintiff and used the alter ego doctrine to deem Morgan a named insured under the defendant's policy.

On appeal, the defendant argued that it was an innocent third party and could not be subjected to liability on an alter ego theory. The court agreed and reversed the trial court's judgment. In order for the alter ego doctrine to apply, the proponent must establish two elements: first, such unity of interest and ownership that the separateness of the entities does not exist, and, second, that if the separate status is maintained, an inequitable result will follow. *Id.* at 469. The alter ego doctrine is applied to avoid inequitable results, not to eliminate the consequences of corporate operations. *Id.* The doctrine may not be applied so as to prejudice the rights of an innocent third party who has dealt with the corporation as such, *Id.*, or to inflict an obligation on an innocent corporation, *Id.* at 471.

The "inequitable result" must occur in the underlying transaction, not the veil-piercing action:

> The appellant's assertion of inequitable result is predicated upon the argument that the respondents intentionally created a corporation without

4

> sufficient assets to meet daily business requirements. The thrust of this argument is the claim of undercapitalization and the contention that a creditor will remain unsatisfied if the corporate veil is not pierced. As we have pointed out above, the prerequisite of "inequitable result" must coexist with the other requirement of unity of interest and ownership, which the trial court has found not to exist in this case. Moreover, we have also indicated that the trial court was justified in its finding of adequate capitalization. Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus set up such an unhappy circumstance as proof of an "inequitable result." In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor. The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil.

*Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal.App.2d 825, 842, 26 Cal.Rptr. 806 (Cal.App. 1 Dist. 1962). *Accord, Roman Catholic Archbishop v. Superior Court,* 15 Cal.App.3d 405, 412, 93 Cal.Rptr. 338 (Cal.App. 1 Dist. 1971).

Generally, in order to enforce the alter ego doctrine, bad faith must be shown. *United States Fire Ins.* at 470. Most importantly, the bad faith or fraudulent or inequitable conduct must be that of the party against whom the doctrine is invoked. *Id.* at 472. *Accord, American Home Ins. Co. v. Travelers Indemnity Co.,* 122 Cal.App.3d 951, 175 Cal.Rptr. 826, 834 (Cal.App. 2 Dist. 1981). In addition, the party against whom the doctrine is invoked must have been a participant in the course of conduct constituting the "abuse of corporate privilege," or must be seeking some inequitable advantage based upon the fiction of separate existence. *United States Fire Ins.* at 472; *American Home Ins.* at 834. In light of these principles, a litigant who seeks to use the alter ego doctrine, not against the parties who

5

conducted the business in the name of the corporation, but as a sword against a third party, is usually faced with a difficult burden.[1] *See, United States Fire Ins.* at 470-71.

In order to invoke the alter ego doctrine so as to disregard the separate corporate status of PACKAGING, the TRUSTEE must establish that PROPACK, in purchasing the Transferred Assets, acted in bad faith or engaged in fraudulent or inequitable conduct. As an initial matter, it should be emphasized that although the TRUSTEE seeks to avoid a transfer as allegedly fraudulent, the claims are based only on theories of constructive fraud on the basis of inadequacy of consideration. No claim is asserted that the transfer was made with actual intent to hinder, delay or defraud by anyone.

The basic facts concerning the DEBTOR'S organizational structure and the Transferred Assets are as follows. The DEBTOR'S core business was selling labels to liquor and wine producers. Through a separate business unit, it also distributed winery production and packaging equipment, parts and support services. Prior to 1996, the packaging business was conducted as an unincorporated division of the DEBTOR.

In 1996, PACKAGING was incorporated in California with the DEBTOR as its sole shareholder. Pursuant to a written Transfer Agreement, and in consideration for all the issued stock of PACKAGING, the DEBTOR transferred to PACKAGING certain personal property described as follows:

> (i) all inventory, work in process, supplies, and customer lists owned by the former division of Fleming Packaging Corporation known as fp Packaging, Inc. (hereinafter "the Business");

---

[1] The alter ego doctrine is rarely raised and even more rarely accepted outside of the context where an equitable owner of a sham corporation is attempting to use the corporate veil to shield himself from liability for that entity's debts. The TRUSTEE cites no case where a court used the alter ego doctrine to transfer ownership of assets from one entity to another to facilitate a fraudulent transfer claim.

6

(ii) all machinery, equipment, furniture, transportation vehicles, tools, and other tangible personal property of the Business; and

(iii) all cash and accounts receivable of the Business.

PACKAGING operated out of a leased office located in Napa, California. However, its books were kept and its accounts payable were processed out of the DEBTOR'S main office in Peoria, Illinois.[2] Subsequent to the 1996 acquisition of personal property from the DEBTOR, PACKAGING purchased additional parts inventory, furniture, fixtures, equipment and related manuals, engineering drawings and other documents. It also entered into certain truck leases. The Transferred Assets include personal property acquired as part of the 1996 acquisition as well as property acquired thereafter.

According to PROPACK, Bank One, as lead bank for a consortium of lenders, held a perfected security interest in substantially all of the assets of the DEBTOR and its subsidiaries, including PACKAGING. The TRUSTEE disputes that Bank One had a valid lien on any assets owned by PACKAGING. The TRUSTEE correctly points out that the Loan Agreement dated as of August 27, 1997, between the DEBTOR its lenders, does not identify PACKAGING as a party. Likewise, the UCC Financing Statement filed January 30, 2001, incorrectly characterizes "fp Packaging, Inc." as merely an assumed name of the DEBTOR. These documents cast doubt on whether Bank One held a perfected security interest in the assets of PACKAGING.

In the Court's view, however, this disputed question of fact is not material. If, as the TRUSTEE argues, the Transferred Assets were owned by the DEBTOR, Bank One's lien

---

[2]The deposition transcripts and declarations filed by the parties contain numerous assertions of fact pertaining to the separateness or lack of separateness between the DEBTOR and PACKAGING. In their briefs, the parties have spent a great deal of time and effort to marshal the facts that support their positions on this issue. Those facts and arguments will not be rehashed here since the Court's decision does not turn on whether or not the corporations operated with a particular level of independence from each other.

7

would attach since it is undisputed that Bank One held a perfected lien on all of the DEBTOR'S personal property. If, on the other hand, the Transferred Assets were property of PACKAGING not covered by Bank One's lien, the TRUSTEE would have no claim to avoid the transfer of assets not owned by the DEBTOR. The existence or nonexistence of a lien on the Transferred Assets is not probative of whether PROPACK acted in bad faith.

Whether or not Bank One had a lien on the Transferred Assets, the parties to the PROPACK transaction acted as if it did. The facts that led up to that transaction are as follows. By the beginning of 2003, with the DEBTOR in default on its obligations to Bank One, the DEBTOR'S majority shareholder, Goldfarb Corporation, agreed with Bank One that the DEBTOR would be sold. On February 10, 2003, the DEBTOR entered into a Fifth Amendment to Loan Agreement with Bank One which provided for the sale of the DEBTOR'S assets. Bank One anticipated that the assets would be sold in a bankruptcy proceeding. Upon execution of the Fifth Amendment, the DEBTOR retained a consultant, Mesirow Financial, Inc., to represent its interests in any future sale. Renaissance Mark was identified as a potential purchaser of the DEBTOR'S assets.

On February 28, 2003, PACKAGING'S former President, Gregory Fulford, made an offer to purchase the assets of PACKAGING and assume certain liabilities for a net sum that Mesirow calculated to be $277,025. The offer was not accepted. By the end of March, 2003, Renaissance Mark decided not to include PACKAGING'S assets in its anticipated purchase of the DEBTOR and authorized the DEBTOR to sell PACKAGING'S assets separately on the condition that the purchaser be required to enter into a non-compete agreement. Bank One agreed to release its purported lien on PACKAGING'S assets when sold to a separate buyer in consideration for payment of the sale proceeds to Bank One.

8

In March, 2003, certain major suppliers to PACKAGING communicated an intent to terminate their relationship with PACKAGING. The accounting firm hired by Renaissance Mark determined that PACKAGING had a negative net worth. On April 2, 2003, Fulford made a second offer to purchase PACKAGING'S assets. This offer was also not accepted. On April 10, 2003, the following three individuals resigned from their employment with PACKAGING: Josip Mironicki and Richard White, both sales representatives, and David Means, Director of Administration and Technical Support. None of these individuals was ever a shareholder, director or officer of the DEBTOR or PACKAGING. Immediately upon resigning, these three formed PROPACK as a California limited liability company.

Means was aware of Fulford's interest in purchasing PACKAGING and phoned Fulford to advise him of the creation of PROPACK. On April 23, 2003, Fulford became a member of PROPACK. An Asset Purchase Agreement was entered into as of April 25, 2003, for PROPACK to purchase the Transferred Assets for a cash price of $387,805.01. The Agreement identifies the DEBTOR and PACKAGING together as the "Seller." Bank One approved the purchase price for the Transferred Assets and, by letter of April 25, 2003, agreed to release its lien on the Transferred Assets upon receipt of the sum of $387,805.01.

The parties dispute the disposition of the proceeds. PROPACK represents that the money was wire transferred directly to Bank One. The TRUSTEE asserts that the funds were deposited in the DEBTOR'S "general operating account and used in the ordinary course" of the DEBTOR'S business.[3] There is no evidence in the record that traces the

---

[3] It is difficult to understand how this fundamental fact - where the money went - could still be disputed this late in the litigation, after a vast amount of discovery has been conducted. A substantial amount of circumstantial evidence in the record supports the conclusion that the money was paid to Bank One per its agreement with the

9

funds. Much of the circumstantial evidence supports a contrary conclusion, that the funds were paid to Bank One in consideration for its release of lien against the Transferred Assets. It is doubtful that Bank One would have permitted anything less.

The materiality of this fact must be gauged by whether and how strongly it tends to prove or disprove that an inequitable result will follow if PACKAGING'S separate corporate status is honored. If, in fact, the sale proceeds were transferred to and used by the DEBTOR, the DEBTOR received an unexpected benefit. If so, that result occurred not because the parties to the transaction honored PACKAGING'S separate status, but because they disregarded it. They allowed PACKAGING'S funds to be used by the DEBTOR, which obviously worked to the benefit of the DEBTOR and the DEBTOR'S creditors, which is the constituency that the TRUSTEE represents.

So even if the TRUSTEE'S factual assertion is true, that the sale proceeds were not paid to Bank One, but were used by the DEBTOR, it tends to disprove the TRUSTEE'S alter ego theory. If the DEBTOR received the proceeds, that disposition of the funds did not result from the parties having honored PACKAGING'S separateness. Neither the DEBTOR nor its creditors suffered an inequity but, instead, received a benefit.

What if the proceeds from sale of the Transferred Assets were paid to Bank One as PROPACK asserts? If Bank One held a lien on the assets, then the payment was entirely

---

DEBTOR. Yet George Gialenios, the DEBTOR'S CEO at the time, testified as follows at his deposition on July 10, 2006:

> Q: Under the terms of the asset purchase agreement, fp Packaging was sold for $387,805.01, do you know what happened to the net proceeds from that sale?
> A: I believe it was allowed to stay in the business, and so we used it in the normal course of business, I believe.
> Q: The funds were allowed to stay within Fleming Packaging?
> A: Fleming Packaging.
> Q: And Fleming Packaging used the proceeds?
> A: I believe so, yes.

10

in accordance with the contractual obligations of the parties, with no unfairness or inequity to anyone. If Bank One did not hold a lien but received the proceeds anyway, then the DEBTOR received the benefit of having its indebtedness to Bank One reduced. No unfairness or inequity was suffered by the DEBTOR or its creditors under either scenario.

Further, nothing in the record indicates that PROPACK acted in bad faith or engaged in fraudulent or inequitable conduct. The TRUSTEE attempts to cast an aspersion by the fact that PROPACK'S founding members were former employees of the DEBTOR and a subsequent member, Fulford, was an officer of the DEBTOR and formerly in a position of authority over the packaging business. The TRUSTEE calls PROPACK an "insider" of the DEBTOR. This argument is of no moment as the relationship between PROPACK'S members and the DEBTOR is not indicative of any conduct by PROPACK that can be characterized as bad faith, fraudulent or inequitable. In fact, the record is devoid of any evidence of such conduct. All of the evidence indicates that the terms of PROPACK'S purchase were not affected by whether the assets were owned by the DEBTOR or PACKAGING. The purchase was made possible only because Renaissance Mark declined to purchase the Transferred Assets and Bank One ultimately approved PROPACK'S third proposal.

Further, there is no evidence that would support a determination that if the separate corporate status of PACKAGING is maintained, an inequitable result will follow. In addition, even if it was determined that the DEBTOR and PACKAGING engaged in a course of conduct constituting an abuse of the corporate privilege, there is no evidence that would support a finding that PROPACK facilitated or participated in the abuse, i.e., the failure of the DEBTOR and PACKAGING to maintain a requisite level of independence.

11

Finally, PROPACK is not seeking an inequitable advantage based upon the separate existence of PACKAGING. All of the evidence in the record supports the conclusion that the sale of the Transferred Assets to PROPACK would have been made whether or not PACKAGING was, in fact, a separate entity.

For these reasons, the TRUSTEE'S alter ego or veil-piercing theory is unsupportable under California law and must be rejected. Therefore, it is not necessary for the Court to consider whether the DEBTOR and PACKAGING operated with such unity of interest and ownership that their separate status must be disregarded.

**Ownership of the Transferred Assets**

The Court will next address the ownership of the Transferred Assets as between the DEBTOR and PACKAGING. Only if the DEBTOR had a property interest in the assets may the TRUSTEE'S claim stand. The TRUSTEE maintains that a genuine issue of fact exists as to which corporation owned the assets. The TRUSTEE relies on Gialenios's deposition testimony that the proceeds were paid to and used by the DEBTOR, not PACKAGING, and on the fact that the Asset Purchase Agreement identified the DEBTOR and PACKAGING together as the "Seller." The TRUSTEE also points out that the August 27, 1997 Loan Agreement between the DEBTOR and its lenders contains the following covenant:

> Notwithstanding anything herein to the contrary, fp Packaging, Inc. shall not be required to be a Guarantor hereunder or deliver any Security Documents until such time as it has any assets, and the Company represents that fp Packaging, Inc. does not have any assets.

Loan Agreement, ¶ 5.1(g). The Loan Agreement postdated the alleged March, 1996 transfer of the packaging division assets from the DEBTOR to PACKAGING by 17 months.

12

PROPACK argues that the above-quoted covenant made by the DEBTOR is "immaterial because the failure of Fleming to deliver documents to Bank One in 1997 is not probative of the corporate status of fp Packaging in 2003." It is probative of the ownership issue, however, because it contradicts the March, 1996 transfer.

The UCC-1 Financing Statement filed by Bank One on January 21, 2001, is filed against the DEBTOR. An attachment lists other names that the DEBTOR "operates under." Nothing in the record indicates that Bank One filed a separate UCC-1 against PACKAGING. In the Court's view, it follows that as of January, 2001, Bank One still believed that PACKAGING owned no assets and the DEBTOR had not advised Bank One to the contrary.[4] These inferences tend to prove that PACKAGING owned no assets.

The Transferred Assets include furniture, fixtures and equipment, parts inventory, documents relating to the parts and equipment, and data stored in the DEBTOR'S computer system. The assets that the DEBTOR transferred to PACKAGING on March 29, 1996, seven years earlier, included furniture, machinery, equipment, customer lists and inventory. Other than some furniture and some historical data, it is unlikely that the Transferred Assets included any property that was part of the 1996 initial capitalization of PACKAGING. Therefore, the fact that the DEBTOR transferred certain assets to PACKAGING in 1996 says little about whether PACKAGING owned the Transferred Assets, most of which were acquired subsequent to that event.

---

[4] Had Bank One been aware that PACKAGING owned substantial assets, it probably would have required PACKAGING to grant a security interest in its assets and would have filed a UCC-1 against PACKAGING.

PROPACK argues that since the documents relating to the parts and equipment were stored at PACKAGING'S Napa offices, those documents "were clearly the property of Packaging." The Court does not agree that the storage location is dispositive. A more reasonable deduction is that the documents follow the parts and equipment – whoever owns the parts and equipment almost certainly owns the related documents, no matter where stored.

PROPACK argues that it established conclusively that PACKAGING owned the parts inventory, sold as part of the Transferred Assets, through a random sampling of purchase orders identifying PACKAGING as the purchaser. The Court is not persuaded that sampling of documents may be used to establish ownership of a large group of assets. Neither does the fact that purchase orders were issued in PACKAGING'S name constitute conclusive proof of ownership.

PROPACK relies on the Declaration of David Means, formerly PACKAGING'S Director of Administration and Technical Support. In paragraph 15 of his Declaration, Means states that the Transferred Assets "were the property of fp Packaging, Inc." In paragraph 18 of his Declaration, Means states that the Inventory Report that lists the inventory purchased by PROPACK lists parts that "were either acquired by fp Packaging from Fleming on March 29, 1996, or purchased by fp Packaging after March 29, 1996." In paragraph 22 of his Declaration, Means states that the items of furniture, fixtures and equipment listed on a Depreciation Report as having been acquired after March 29, 1996, "were purchased and paid for by fp Packaging."

These statements by Means are conclusory in nature, without detail or substantiation. The statements appear to be assertions of an opinion by Means, rather than a recitation of facts of which he has personal knowledge. His declaration does not contain any specifics about how he acquired personal knowledge as to which entity, the DEBTOR or PACKAGING, actually paid for each item of inventory or furniture, or how or whether those items were accounted for as PACKAGING'S property as of April, 2003, in the books and records maintained by or on behalf of the DEBTOR and PACKAGING.[5] His boilerplate assertion of competency in paragraph 34 of the Declaration is insufficient to overcome the lack of adequate foundation for his conclusory statements.[6]

The majority of the evidence in the record tends to prove, circumstantially, that PACKAGING owned the Transferred Assets at the time of sale to PROPACK. The evidence is not to be weighed at the summary judgment stage, however. The record contains enough evidence to the contrary that a genuine issue of fact exists as to ownership of the Transferred Assets. Accordingly, summary judgment on Count I must be denied.

**Count II**

In Count II of the Complaint, the TRUSTEE seeks to avoid PROPACK'S purchase of the Transferred Assets as fraudulent under the UFTA. A trustee in a Chapter 7 case is

---

[5] Other routine evidence of ownership is also noticeably absent, such as whether PACKAGING insured the Transferred Assets and was named on the policy as owner and loss payee. Surprisingly, also absent from the record is any direct evidence that PACKAGING was in good standing as of April, 2003, with the California Secretary of State's office.

[6] PROPACK'S motion to strike the affidavit of Paul Wayvon, resolved by separate order, was granted as to certain conclusory assertions. The Means Declaration suffers from similar deficiencies. The Court placed little weight on the Wayvon affidavit and the result reached herein would have been the same even if the Wayvon affidavit had been stricken in its entirety.

vested with the power to bring such avoidance actions based on state law pursuant to 11 U.S.C. § 544(b)(1). The Complaint cites the Illinois version of the UFTA, 740 ILCS 160/1 *et. seq.* PROPACK, although it argues that the California version applies, which is codified at Cal.Civ.Code § 3439 *et. seq.*, contends that the pertinent substantive provisions of the California and Illinois statutes are identical so that it makes no difference which version applies. The Court agrees.

Specifically, PROPACK relies on the UFTA's definition of "asset" that means "property of the debtor" but excludes "property to the extent it is encumbered by a valid lien." Cal.Civ.Code § 3439.01(a)(1); 740 ILCS 160/2(b)(1). The Official Comments to the Uniform Fraudulent Transfer Act explain that by excluding from the term "asset" an interest that is beyond reach by unsecured creditors because subject to a valid lien, it is the intent of the Act to provide remedies for unsecured creditors against transfers that impede them in the collection of their claims. As indicated above, it is an unresolved issue whether Bank One held a valid lien on assets owned by PACKAGING.[7]

The TRUSTEE is between a rock and a hard place on this issue. If the Transferred Assets were owned by PACKAGING, they are not property of the estate and the TRUSTEE has no claim whether or not Bank One had a lien. If the Transferred Assets were owned by the DEBTOR, then there is no dispute that they were encumbered by Bank One's lien. If the value of the assets exceeds the lien amount, however, the unencumbered portion is

---

[7]PROPACK does not raise, at this stage, a parallel argument that the claim asserted in Count I under § 548(a)(1)(B) is dependent upon or is viable only to the extent that the DEBTOR had equity in the Transferred Assets. *See, e.g., In re Consolidated Pioneer Mortg. Entities,* 211 B.R. 704, 717-18 (S.D.Cal. 1997) (construing Section 548 to include a diminution of the estate factor); *aff'd in part,* 166 F.3d 342 (9th Cir. 1999) (affirming judgment that no fraudulent transfer occurred on alternative ground that transferee was fully secured so that transfer did not deplete debtor's estate).

16

an "asset" for UFTA purposes. *Webster Industries, Inc. v. Northwood Doors, Inc.,* 320 F.Supp.2d 821, 837 (N.D.Iowa 2004); *Mussetter v. Lyke,* 10 F.Supp.2d 944, 958-59 (N.D.Ill. 1998) (applying California law); *In re McFarland,* 170 B.R. 613, 622-23 (Bankr.S.D.Ohio 1994). On the other hand, if the lien amount exceeds the asset value at the time of the transfer, no "assets" were transferred and no claim under the UFTA is viable. *Compuware Corp. v. Innovatec Communications, LLC,* 2005 WL 2076717 (E.D.Wisc. 2005).

The value of the Transferred Assets is disputed. The TRUSTEE alleges a value of $5.7M, while PROPACK contends that its purchase price of $387,805.01 represents reasonably equivalent value at the time of the transfer. At this stage, the record contains no expert appraisals or other evidence of value. It is undisputed, however, that Bank One was left with a deficiency balance of over $8.8M after all of its collateral was liquidated. Therefore, even if the TRUSTEE'S value is accepted as correct, and Bank One had received that value, it would still have had a large deficiency balance in excess of $3.0M. Thus, under no circumstances could the Transferred Assets constitute "assets" for UFTA purposes.

The TRUSTEE argues that an asset is property of the estate under the Bankruptcy Code even if it is fully encumbered. When bringing an avoidance action under Section 544(b), however, the extent of the trustee's rights is determined entirely by state law. Section 544(b) confers upon the trustee no greater rights of avoidance than an actual creditor would have if it were asserting the claim on its own behalf. *In re G-I Holdings, Inc.,* 313 B.R. 612, 633 (Bankr.D.N.J. 2004). The UFTA's definition of "asset" clearly and

17

unambiguously excludes encumbered property. The TRUSTEE is subject to that exclusion the same as any creditor suing in state court. PROPACK is entitled to summary judgment on Count II.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###